502 S.E.2d 92

**The STATE, Respondent,**

v.

**Thomas Treshawn IVEY, Appellant.**

**No. 24805.**

Supreme Court of South Carolina.

Heard Jan. 7, 1997.
Decided June 15, 1998.
Rehearing Denied July 20, 1998.

Deputy Chief Attorney Joseph L. Savitz, III, of S.C., Office of Appellate Defense, Columbia, for appellant.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald Zelenka, Columbia; and Solicitor Walter M. Bailey, Summerville, for respondent.

BURNETT, Justice:

Appellant Thomas Treshawn Ivey was convicted of the murder, kidnaping, and armed robbery of Robert Montgomery. He was sentenced to death for murder and thirty years imprisonment for armed robbery. This appeal consolidates appellant's direct appeal with the mandatory review provisions of S.C.Code Ann. § 16–3–25 (1985). We affirm.

## FACTS

In early January 1993, appellant and Vincent Neumon escaped from a prison in Alabama. Appellant and Neumon stole a truck and drove to Columbia, South Carolina, Neumon's hometown.

Neumon testified during the guilt phase of appellant's trial. According to Neumon's testimony, on the evening of January 13, 1993, appellant suggested the two men should rob some people. Appellant carried a pistol in his coat pocket while the two men walked through Columbia. They stopped at Owens Steel. A maroon Suburban was parked outside. Mr. Montgomery came out of Owens Steel. At gunpoint, appellant led Montgomery back into the building to obtain the keys to the vehicle. When they returned, Neumon drove the vehicle, Mr. Montgomery sat beside him, and appellant sat in the back. Mr. Montgomery was scared and begged the two men not to hurt him; he stated he had a young child at home and his wife was expecting another child. Neumon and appellant assured Mr. Montgomery he would not be hurt.

Neumon drove to North, South Carolina. At that point, appellant stated "this is far enough." Neumon stopped the vehicle. Appellant told Mr. Montgomery to get out of the vehicle. Neumon remained in the vehicle. Appellant and Mr. Montgomery walked away. Neumon testified he saw the "flame" flash from the gun twice. Appellant returned to the vehicle with the pistol in his hand. Appellant later told Neumon when he shot Mr. Montgomery in the back of the head his hair "jumped up." He then rolled Mr. Montgomery over and shot him in the chest.[1]

Neumon explained, prior to the murder, he (Neumon) borrowed the murder weapon from someone. On cross-examination, defense counsel asked Neumon if he had borrowed the pistol from "Fletch." Neumon stated he had.[2]

---

1. After failing to locate a "chop-shop" in Atlanta, Neumon and appellant disposed of Mr. Montgomery's vehicle in Winnsboro. They stole another vehicle and drove to Sumter. In Sumter, appellant shot and killed police officer Thomas Harrison. Appellant's conviction and death sentence for the murder of Officer Harrison were affirmed by this Court in *State v. Ivey*, 325 S.C. 137, 481 S.E.2d 125 (1997).

2. "Fletch" was not identified as a potential witness during voir dire and did not testify at either stage of appellant's trial.

After a brief recess, the trial judge informed the parties he had received a note from Juror Young which stated: "I know the person, Fletch, that Mr. Neumon was talking about." Defense counsel and the solicitor agreed the judge should examine Juror Young.

After completion of Neumon's testimony, the trial judge asked Juror Young to remain in the courtroom and excused the remaining members of the jury. The trial judge examined Juror Young as follows:

Q. Okay, Ms. Young, you sent out a note that says, "I know the person, Fletch, that Mr. Neumon was talking about."

A. Uh huh.

Q. Do you feel like you know that same person?

A. Yes.

Q. If it is the same person, would that have any effect (sic) on your ability to be fair and impartial in this case, just because you know Fletch?

A. No, it shouldn't.

Q. Ma'am.

A. It shouldn't affect me.

Q. Okay. It shouldn't have any effect (sic) on you at all, you just wanted us to know that?

A. Yeah.

Q. Okay. All right, we appreciate it.

The solicitor stated no objection to Juror Young remaining on the jury. Defense counsel requested Juror Young be removed. The trial judge denied the motion to remove Juror Young, observing she had stated her knowledge of "Fletch" would have no effect on her ability to remain fair and impartial. The trial judge then inquired if either party had "anything else." Defense counsel replied negatively. The court recessed for the evening.

The following morning, after discussing other matters, defense counsel moved to question Juror Young regarding her knowledge of "Fletch." The trial judge denied the motion.

## DISCUSSION

Relying on S.C.Code Ann. §§ 16–3–20(D) and 14–7–1020 (Supp.1997), appellant now argues he was entitled to question Juror Young about her relationship with "Fletch." We disagree.

■ Appellant's request to ask additional questions of Juror Young was untimely. If dissatisfied with the trial judge's examination of Juror Young, appellant should have immediately moved for permission to make additional inquiries of the juror. Appellant's request for additional questioning the day after the trial judge had examined Juror Young and ruled her qualified was untimely. *State v. Nance*, 25 S.C. 168 (1886) (if counsel considered questioning by court perfunctory or otherwise unsatisfactory, the objection should have been made at the time of the questioning); 50A C.J.S. *Juries* § 489 (1997) (a party, by failing to object in a timely fashion, waives any irregularity in the examination of jurors). Accordingly, this issue is not properly preserved for appeal. *State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991) (a contemporaneous objection is required to preserve an error for appellate review).

■ In any event, neither § 16–3–20(D) nor § 14–7–1020 entitled appellant to question Juror Young. Section 14–7–1020 sets forth the parameters of inquiry for prospective jurors by the trial judge. Section 16–3–20(D) grants a capital defendant the right to examine jurors through counsel but does not enlarge the scope of voir dire permitted under § 14–7–1020. *State v. Patterson*, 324 S.C. 5, 482 S.E.2d 760 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 146, 139 L.Ed.2d 92. These two statutes govern the selection of prospective jurors, not the situation where, as here, the court is informed of a matter which may justify the discharge of a seated juror.

■ The trial judge properly inquired into the effect Juror Young's knowledge of "Fletch" would have on her ability to be fair and impartial.[3] Juror Young unequivocally stated her

---

3. 50A C.J.S. *Juries* § 503 (1997) ("[w]here the court is informed of a matter which may justify the discharge of a juror, the court generally must take some action and must inquire into the matter, at least where the juror's competency is in question. The court has the discretion to question a juror whose qualifications have been called into doubt.

knowledge of "Fletch" would have no effect on her ability to render an impartial verdict. The trial judge did not abuse his discretion in allowing Juror Young to remain on the jury. *State v. Thompson,* 278 S.C. 1, 292 S.E.2d 581 (1982), *cert. denied,* 456 U.S. 938, 102 S.Ct. 1996, 72 L.Ed.2d 458, *overruled on other grounds, State v. Torrence, supra* (a juror's competence is within the trial judge's discretion and is not reviewable on appeal unless wholly unsupported by the evidence).

Appellant's remaining issues are affirmed pursuant to Rule 220(b)(1), SCACR, and the following authorities: Issue 1: *State v. Atkins,* 303 S.C. 214, 399 S.E.2d 760 (1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2913, 115 L.Ed.2d 1076 (1991); Issue 3: *State v. Doctor,* 306 S.C. 527, 413 S.E.2d 36 (1992); *State v. Anderson,* 304 S.C. 551, 406 S.E.2d 152 (1991); Issue 4: *State v. Southerland,* 316 S.C. 377, 447 S.E.2d 862 (1994), *cert. denied,* 513 U.S. 1166, 115 S.Ct. 1136, 130 L.Ed.2d 1096 (1995), *overruled on other grounds, State v. Chapman,* 317 S.C. 302, 454 S.E.2d 317 (1995); *State v. Bailey,* 298 S.C. 1, 377 S.E.2d 581 (1989) (issue not preserved for appeal where one ground is raised below and another ground is raised on appeal); Issue 5: *State v. Bailey, id.*

## PROPORTIONALITY REVIEW

■ After reviewing the entire record, we conclude the death sentence was not the result of passion, prejudice, or any other arbitrary factor, and the jury's finding of statutory aggravating circumstances is supported by the evidence.[4] *See* S.C.Code Ann. § 16–3–25 (1985). Further, we hold the death penalty is neither excessive nor disproportionate to that imposed in similar cases. *See State v. Patterson, supra; State v. Humphries,* 325 S.C. 28, 479 S.E.2d 52, *cert. denied,* —— U.S.

---

Where and in what form to conduct an inquiry may depend upon the circumstances.").

**4.** The jury found the statutory aggravating circumstances of murder while in the commission of kidnaping, while in the commission of robbery while armed with a deadly weapon, and while in the commission of larceny with the use of a deadly weapon, and by a person with a prior conviction for murder. S.C.Code Ann. § 16–3–20(C)(a)(1)(b) (d) & (e) and (C)(a)(2) (Supp.1997).

——, 117 S.Ct. 2441, 138 L.Ed.2d 201 (1997); *State v. McWee*, 322 S.C. 387, 472 S.E.2d 235 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 695, 136 L.Ed.2d 618 (1997); *State v. Von Dohlen,* 322 S.C. 234, 471 S.E.2d 689, *cert. denied,* —— U.S. ——, 117 S.Ct. 402, 136 L.Ed.2d 316 (1996); *State v. Young,* 319 S.C. 33, 459 S.E.2d 84 (1995), *cert. denied,* 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996); *State v. Bell,* 305 S.C. 11, 406 S.E.2d 165 (1991), *cert. denied,* 502 U.S. 1038, 112 S.Ct. 888, 116 L.Ed.2d 791 (1992); *State v. Green,* 301 S.C. 347, 392 S.E.2d 157, *cert. denied,* 498 U.S. 881, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990); *State v. Howard,* 295 S.C. 462, 369 S.E.2d 132 (1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036 (1989); *State v. Drayton,* 293 S.C. 417, 361 S.E.2d 329 (1987), *cert. denied,* 484 U.S. 1079, 108 S.Ct. 1060, 98 L.Ed.2d 1021 (1988).

**AFFIRMED.**

MOORE and WALLER, JJ., and JOHN W. KITTREDGE, Acting Associate Justice, concur.

FINNEY, C.J., dissenting in separate opinion.

FINNEY, Chief Justice (Dissenting):

I respectfully dissent. I would affirm appellant's convictions, but I would reverse and remand for a new sentencing proceeding.

Based upon the non-definitive nature of Juror Young's response to the court that her ability to be fair and impartial **"should not"** be affected by the fact that she knew Fletch, and the cursoriness of the trial judge's examination, I would hold that the trial judge erred in failing to allow further examination of Juror Young. (Emphasis added.) During the following portion of his guilt phase cross-examination Vincent Neumon, appellant's accomplice, admitted that he (Neumon) had borrowed the murder weapon from an individual named Fletch.

> Q. All right. Now, this gun that you're talking about that you borrowed, this gun, you knew where to go borrow that gun, didn't you?
>
> A. Yeah.

Q. And you went and you got that from Fletch, did you, over at Belvedere?

A. Yeah.

Q. And Thomas Ivey, you took him with you, because he didn't know how to get to Belvedere, did he?

A. That's true.

Q. All right. So y'all went over there and you talked to Fletch, and you know Fletch, isn't that right? (Transcript of Record does not show a response before the next question.)

Q. That's right. (Transcript of Record does not show a response before the next question.)

Q. All right. And Thomas doesn't know Fletch, does he?

A. No.

Q. Not good enough for Fletch to loan him a gun, but he loaned you the gun, is that right?

A. That's true.

Q. Okay. Now, the way I understand it, you told Fletch, "I'm going to bring you the gun back with some drugs." So you kind of rented it?

A. Yeah.

Q. Okay. And you told Fletch—does he live in Belvedere or y'all just met him over there, do you know? You don't know if he lives there now?

A. No, I don't know if he lives there now.

Q. He might have moved. You told Fletch y'all were going to rob some drug dealers, and isn't it true that since you're from Columbia, you know where the drug dealers live, you know those areas?

A. True.

Subsequently, the jury was sent out and another issue was discussed out of the jury's presence. Prior to bringing the jury back into the courtroom, the trial judge advised counsel that he had received from one of the jurors a note which stated: "I know the person, Fletch, that Mr. Neumon was talking about." With counsel's assent, the Judge ruled that the juror would be questioned at the conclusion of Mr. Neu-

mon's examination, and testimony resumed in the presence of the jury. At the end of the state's case, except for the author of the note, the jurors were excused for the evening recess. Juror Young was then examined by the Court as follows:

Q. Okay, Ms. Young, you sent out a note that says, "I know the person, Fletch, that Mr. Neumon was talking about."

A. Uh huh.

Q. Do you feel like you know that same person?

A. Yes.

Q. If it is the same person, would that have any effect on your ability to be fair and impartial in this case, just because you know Fletch?

A. No, it shouldn't.

Q. Ma'am.

A. It shouldn't affect me.

Q. Okay. It shouldn't have any effect on you at all, you just wanted us to know that?

A. Yeah.

Q. Okay. All right, we appreciate it.

The State did not object to allowing Juror Young to continue on the case. Defense counsel objected as follows:

MR. CULLER: Your Honor, we would argue that, you know, certainly if she has said that she knows the same Fletch, this guy is someone from whom the gun was rented, the drugs would be provided later, it was a Three fifty-seven Magnum, that causes us some problems and we would ask that she be removed.

The Court denied the defense motion to remove Ms. Young from the jury. When the trial resumed the next morning Mr. Early, one of the defense attorneys, made the following request to question Juror Young:

MR. EARLY: You recall, Ms. Young was a juror that we had moved to strike for cause in Winnsboro. She initially started out as a, a always death juror, and then she equivocated and came around, according the—Your Honor ruled that she came around to a Number Three juror. We just feel like that Fletch, who was the guy that

provided the gun to Neumon, being involved in the drug world, the gun world, and all the other situations, he's such an important character in this event, that I'd like to know more about her knowledge of Fletch and question her on her ability to be unbiased and fair in this case.

The Court denied appellant's motion to question Juror Young, holding that Fletch was neither a witness nor a party and that he was not a major player in the case. Appellant contends it was reversible error for the court to deny his motion to allow further questioning of Juror Young and, consequently, his death sentence should be vacated and remanded for resentencing. I agree.

The question of the impartiality of the juror is addressed to the discretion of the trial judge. *State v. Johnson*, 248 S.C. 153, 149 S.E.2d 348 (1966). *Johnson* involved the qualification of members of the jury venire before being seated as jurors and dealt with the trial judge's discretion in qualifying a jury based upon general information available at the beginning of that trial. Likewise, S.C.Code §§ 16–3–20(D) and 14–7–1020 (1976) (Supp.1997) address voir dire examination of venirepersons. Conversely, the question before this court relates to a particular juror's knowledge of an individual who was not the subject of voir dire examination, but who was introduced through testimony elicited during the trial.

In denying appellant's request for further questioning of Juror Young, the trial judge stated that Fletch "... is, if anything, a very peripheral character, but certainly, not even a witness." On the contrary, mention of the name Fletch occurs several times in the record in conjunction with crucial evidence. Cross examination connected Fletch with illegal activities which had the potential to be known by people who knew Fletch, including Juror Young. Testimony suggested that Fletch was involved in drug dealing. Fletch was reportedly the person who provided the gun used in the commission of the crime for which the appellant was charged. Upon hearing the testimony concerning Fletch, Juror Young obviously felt compelled to apprise the trial court of the fact that she knew Fletch.

Essentially, the trial judge's examination consisted of restating the text of Ms. Young's note, and no further information

about the juror's knowledge of or relationship with Fletch was elicited by the court. I hold the view that after Juror Young's repeated response that knowing Fletch **"should not"** affect her ability to be fair and impartial, further examination was required to ascertain the context in which the juror was acquainted with Fletch. Recognizing that qualification of jurors on voir dire is within the discretion of the judge, a review of the voir dire examination of Juror Young tends to support Appellant's concern over Juror Young's ability to accord fair and impartial consideration to this capital case. In her reply to a series of voir dire questions on her view of imposing capital punishment, the record reflects that Juror Young equivocated on whether she could vote for a penalty of less than death for a defendant found guilty of killing someone. The defense had sought unsuccessfully to strike Juror Young for cause on the basis of her responses on voir dire examination.

The majority cites *State v. Nance*, 25 S.C. 168 (1886), to support its holding that the appellant waived his right to further examination of the juror by failing to make a timely objection. I note that, according to the record, the issue of Juror Young's disclosure that she knew Fletch was the last business taken up by the court at the end of the court day and among the first items considered when the trial resumed the following morning.

As set forth in the majority opinion, whether and in what form to conduct an inquiry may depend upon the circumstances. 50A C.J.S. *Juries* § 503 (1997). The trial of a capital case and the imposition of the resulting punishment are inherently different from any other criminal prosecution. At the very least, justice demands and conscience dictates that the irretrievable extinguishment of human life by the state be preceded by a conscionable effort to be thorough, fair and reasonably certain that adequate measures are ... observed to minimize the likelihood of an illegal execution. *State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991) (Finney, A.J., dissenting). Clearly, the circumstances attending Juror Young's revelation warranted a more thorough inquiry than was conducted.

I would hold that the record before this court supports appellant's entitlement to a new sentencing proceeding due to the failure of the trial court to ascertain, through appropriate examination, the extent of Juror Young's knowledge of Fletch and whether or not there existed such knowledge of or connection with Fletch as would affect her ability to render a fair and impartial verdict.

The cumulative effective of Juror Young's inclination to impose the penalty of death, and the absence from this record of responses by the Juror which would enable the court to ascertain the extent of her knowledge of Fletch, an individual whose name was raised in connection with parties whose roles were significant in this case raises, in my mind, serious questions as to Juror Young's ability to accord the appellant a fair and impartial trial. I would reverse appellant's death sentence and remand for a new sentencing proceeding.