646 S.E.2d 888

**The STATE, Respondent,**

v.

**Braxton J. BELL, Appellant.**

**No. 4251.**

Court of Appeals of South Carolina.

Submitted May 1, 2007.

Decided June 4, 2007.

Deputy Chief Attorney for Capital Appeals Robert M. Dudek of the South Carolina Commission on Indigent Defense, of Columbia, for Appellant.

Attorney General Henry D. McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Special Assistant Attorney General Amie L. Clifford, all of Columbia; and Solicitor Christina T. Adams, of Anderson, for Respondent.

HUFF, J.:

Appellant, Braxton J. Bell, was convicted of voluntary manslaughter and possession of a firearm during the commission of a violent crime. He appeals, asserting the trial judge erred in (1) failing to disqualify the Tenth Judicial Circuit Solicitor's Office and (2) refusing to dismiss a juror. We affirm.[1]

## FACTUAL/PROCEDURAL BACKGROUND

Braxton Bell was indicted for murder and possession of a firearm during the commission of a violent crime in regard to the shooting death of Jonathan Gambrell at the Newport Commons apartment complex in Anderson County. The case proceeded to trial, at which time Bell presented a claim of self-defense. The jury convicted Bell of the lesser offense of voluntary manslaughter, as well as the weapon possession charge. The trial court sentenced him to thirty years for

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

manslaughter and five years for possession of the firearm during the commission of a violent crime.

## LAW/ANALYSIS

Bell raises two issues on appeal. He contends the trial court erred in refusing to disqualify the Tenth Judicial Circuit Solicitor's Office from prosecuting the case because a current investigator with the Solicitor's Office was a former investigator for the Anderson County Public Defender's Office who had interviewed appellant while with the Public Defender's Office. He further maintains the trial court erred in refusing to dismiss a juror who reported she was asked by a daycare worker whether she was serving on the case where the daycare worker's cousin had been shot.

### I. Disqualification of Solicitor's Office

The record shows that at the start of the case, Bell made a motion to disqualify the Solicitor's Office from prosecuting his case arguing there was a conflict of interest based on the investigator for the Solicitor's Office, Jimmy Penn, having previously interviewed Bell while Penn was an investigator for the Public Defender's Office. Counsel for the defense stated it was his belief that "there was information transferred from Mr. Penn to the Solicitor's Office" resulting in actual prejudice to Bell. Counsel further asserted, even if the court found no actual prejudice, the Solicitor's Office should be disqualified based on "the perception of a conflict" in Penn "switching from one side to the other." Finally, counsel maintained failure to disqualify the Solicitor's Office would violate Bell's constitutional right to effective assistance of counsel because when Penn "switched sides" it caused a chilling effect on Bell being able to talk to his attorneys.

The trial court held an in camera hearing on the matter at which time the defense presented Bell's testimony. Bell stated that on November 16, 2004, Penn came to the jail to talk to him about his case. Penn identified himself at that time as an investigator with the Public Defender's Office. Penn asked Bell some questions and Bell told him he was being charged with murder, that he and the victim had been arguing, and that someone else shot the victim and he, Bell,

ran with the others. This information was recorded on the bottom of an interview sheet. Penn spoke with Bell for about fifteen or twenty minutes. Bell testified that Penn only came to see him that one time, and sometime after January 1, 2005, he learned from other inmates that Penn had become an investigator for the Solicitor's Office. Bell maintained that he felt betrayed when Penn switched sides and that when a different attorney appeared to represent him at his preliminary hearing than the one who had been to see him twice before, he felt betrayed again. According to Bell, this created a difficulty in him discussing the case with his current attorney, and the first time they discussed self-defense was approximately two weeks before trial.

The State then called Penn to the stand to testify in the hearing. Penn stated that he began working for the Solicitor's Office on January 12, 2005, having previously worked for the Anderson County Public Defender's Office. Penn acknowledged it was his handwriting on the client interview sheet [2] dated November 16, 2004. However, he stated it was routine for him to go to the jail and speak with clients and he would see approximately ten to twenty clients a week. He did not remember what he had written on the document until defense counsel stated what the interview sheet included. Penn stated he remembered a bond reduction request form for Bell that had been faxed to him at the Solicitor's Office from the Public Defender's Office. He recalled he brought the matter to the prosecuting attorney's attention, who relayed to Penn there was no change of circumstances justifying a reduction in bond, which Penn then relayed to the Public Defender's Office. His only other involvement with this case was to serve subpoenas on witnesses, which he did because the prosecuting attorney's investigator was off work that week. He further denied ever speaking to the other investigator about the case and denied talking to the witnesses he served about the case. When asked if he had shared any confidential information with the

2. The client interview sheet is a form document wherein Penn recorded personal information about Bell such as his address, age, social security number, marital status and education. At the bottom of the form was a section for notes wherein Penn handwrote the name of the victim and the location of the incident, and noted "[Defendant and] victim had an argument at the apartment.... Somebody shot him [and defendant] ran with everybody else."

solicitor that he learned from Bell at the interview, Penn replied, "Absolutely not." He further denied having any confidential conversations with anyone else involved in the matter.

The trial court found there was no prejudice to Bell, noting he believed Penn did not even remember the interview and, even if he had, that information was not unduly prejudicial. It found that Penn's service of subpoenas was a ministerial act and the evidence showed Penn did not take that opportunity to discuss the case with anyone. It further determined there was nothing Penn did in response to the bond reduction request that would amount to prejudice to Bell. Finally, the court found any chilling effect on Bell's cooperation with his attorney was an unreasonable reaction. The court therefore denied Bell's motion to disqualify the Solicitor's Office.

On appeal, Bell contends the trial court erred in failing to disqualify the Solicitor's Office based on the fact that Bell initially denied to Penn that he shot the victim, and this denial was clearly inconsistent with the self-defense claim he presented at trial. He argues his right to effective representation was adversely affected by Penn's betrayal, that Penn's later participation in his prosecution created more than just an appearance of impropriety, and that there was no clear evidence that no actual breach of confidence occurred. Bell also asserts Penn's participation likely led the Solicitor's Office to feel, because of Bell's initial statement to Penn, that Bell's claim of self-defense was not genuine, therefore adversely affecting the trial and any effort to plea bargain his case. He thus maintains the trial court abused its discretion in refusing to disqualify the Solicitor's Office and he is therefore entitled to a new trial. We disagree.

In *State v. Smart*, 278 S.C. 515, 299 S.E.2d 686 (1982), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991), our supreme court addressed the standard for disqualification of a Solicitor's Office where an attorney in that office had been employed by the Public Defender's Office during the pendency of charges against the appellant. There, the court rejected the standard of a presumption of betrayal from mere allegation of successive adverse representation resulting in a per se disqualification. *Id.*

at 518, 299 S.E.2d at 688. Instead, the court adopted the requirement of a showing of actual prejudice to the defendant's case. *Id.* at 518–19, 299 S.E.2d at 688. Finding no evidence that any secrets or confidences of Smart were revealed, the court affirmed the denial of Smart's motion for disqualification. *Id.* at 520–521, 299 S.E.2d at 689. Thereafter, in *State v. Chisolm*, 312 S.C. 235, 439 S.E.2d 850 (1994), our supreme court again articulated that an appellant who seeks disqualification of a Solicitor's Office must show actual prejudice. *Id.* at 238, 439 S.E.2d at 852.

Bell attempts to distinguish *Smart* on the basis that the attorney involved in that case did not discuss evidentiary matters or trial strategy with Smart while working for the defense, whereas investigator Penn interviewed Bell regarding the circumstances surrounding the incident. He argues that involvement with the defense, along with Penn's later involvement in the request for bond reduction and service of subpoenas while working for the Solicitor's Office, adversely affected the trial of his case and any effort to plea bargain. We disagree.

In *Smart,* attorney DuTremble was assigned to prepare a brief on behalf of Smart while working for the Public Defender's Office. Thereafter, attorney DuTremble's work for the prosecution consisted of research on a narrow issue of law regarding admissibility of certain psychiatric evaluations. Our supreme court, noting attorney DuTremble denied under oath that he personally spoke with Smart or that he discussed evidentiary matters or trial strategy with Smart's counsel, determined the facts failed to suggest betrayal of any secrets or confidences. *Smart,* 278 S.C. at 519, 299 S.E.2d at 688–89. While, in the case at hand, investigator Penn admitted the client interview document regarding Bell was in his handwriting, he denied remembering the contents of the document, stating he interviewed anywhere from ten to twenty clients a week when he worked for the Public Defender's Office. Further, his involvement with Bell's case once he moved to the Solicitor's Office was minimal, involving only ministerial acts. There simply is no evidence investigator Penn was involved with any substantive or strategic prosecution work suggestive of betrayal of any secrets or confidences. Indeed, Penn denied ever speaking to the prosecuting attorney or the other

investigator at the Solicitor's Office or any of the witnesses he served about the case, and adamantly maintained under oath that he had no confidential conversations with anyone else involved in the matter. Contrary to Bell's assertion, a thorough review of the record reveals no breach of confidence occurred and there was no actual prejudice to Bell.

Additionally, we find no merit to Bell's argument that he was adversely affected in any effort to plea bargain his case. First, we note there is no evidence of record that Bell ever attempted to attain a plea bargain. Second, Bell has no constitutional right to plea bargain. *See State v. Chisolm,* 312 S.C. 235, 237–38, 439 S.E.2d 850, 851–52 (1994) (holding, where appellant claimed prejudice because the solicitor failed to negotiate any plea agreement in matter where assistant solicitor had inappropriate communication with appellant during pendency of charges, appellant failed to show actual prejudice necessary to disqualify the solicitor's office, noting appellant had no constitutional right to plea bargain).

Finally, Bell cites the case of *State v. Quattlebaum,* 338 S.C. 441, 527 S.E.2d 105 (2000) for the proposition that our courts will not tolerate "interference or corruption into attorney-client confidences" and that a solicitor's office should be disqualified based on the damage such interference does to our entire criminal justice system. *Quattlebaum* is clearly distinguishable from the case sub judice. There, our supreme court found the solicitor's office should have been disqualified based on a violation of Quattlebaum's Sixth Amendment right to counsel, as well as to protect the integrity of the judicial system, where a member of the prosecution team intentionally eavesdropped on a confidential defense conversation. The court held in *Quattlebaum* that a defendant must show either deliberate prosecutorial misconduct or prejudice to make out a Sixth Amendment violation of right to counsel, but not both. *Id.* at 448, 527 S.E.2d at 109. It noted that deliberate prosecutorial misconduct raises an irrebuttable presumption of prejudice. *Id.* The court further held the solicitor's office should have also been disqualified because the deliberate prosecutorial conduct threatened rights fundamental to liberty and justice, calling into question the integrity of the entire judicial system. *Id.* at 449, 527 S.E.2d at 109. Here, however, there is no such deliberate prosecutorial misconduct. Be-

cause we have found no actual prejudice to Bell, the trial court did not abuse its discretion in refusing to disqualify the Solicitor's Office from the prosecution of Bell's case.

## II. Dismissal of Juror

■ Following jury selection, the trial court informed the jurors the trial would not start until after lunch and they were to be back at 3:00 o'clock that afternoon. The court instructed the jurors that they should not talk to anybody about the case and if anyone asked them, to tell them they had been selected to serve on a jury but they could not even tell them the name of the case. He told the jurors not to discuss the case among themselves or with anyone else. Upon their return, the trial court informed the parties one of the jurors had reported someone talked to her about the case when she took her child to daycare and explained she may be late coming back to get the child because she was on a jury. The trial court then brought the juror in for questioning to determine whether she should be disqualified. The following colloquy occurred between the judge and the juror:

[Court]: ... I understand you had something that happened at lunch you wanted to inform the court about?

[Juror]: Yes, sir.

[Court]: Tell us about that, please.

[Juror]: I took my son to a daycare and was explaining to them why it was last minute, that they were squeezing him in, they didn't have room, but I had been selected for the jury, for jury duty. That's all I said.

[Court]: This is not a regular daycare?

[Juror]: It's an after-school type thing.

[Court]: I mean, is it one you regularly use?

[Juror]: Yeah, it's one I go to during the school year, but not during the summer because I teach.

[Court]: All right.

[Juror]: And one of the girls in there said, "My cousin was shot, and his trial begins today. Are you on that jury?" And I said, "I can't talk about it."

[Court]: So you think her cousin was the victim in the case?

[Juror]: The victim, yeah, that's the way it sounded.

[Court]: Okay. And that was the conversation?

[Juror]: (Nodded head.) And then she started to tell another child, and I left the room, and all I heard was, "My cousin was shot." She repeated that.

[Court]: All right. Would anything about that incident cause you to fear your ability to be a fair and impartial juror to both the State and the defendant?

[Juror]: Not me personally. I don't know if she thinks something, if she thinks that I'm on this jury—I don't . . .

[Court]: But it wouldn't affect your decision?

[Juror]: No, it wouldn't affect my decision.

[Court]: Is she someone that you knew, that you regularly

—

[Juror]: She was a former student of mine.

[Court]: Okay. But it wouldn't affect your ability; you could put that aside and make your decision based solely on what you hear in this courtroom?

[Juror]: Yes, yes.

[Court]: All right. You did nothing—you did absolutely right, number one in the way you handled it, and number two telling the bailiff as soon as you got back. So we'll be ready to get started in just a couple minutes, so please retire to the jury room. And don't discuss this with any other juror. Thank you, ma'am.

[Juror]: I won't, I promise.

The State had no objection to having this juror continue in service. The defense, however, did, stating that if the juror was close to the daycare worker, "she may lean that way unintentionally." The defense further expressed concern that when she took her child into the daycare again, the juror might be asked something about the case and, even though she would probably indicate she could not talk about it, the juror would feel pressured. It thus asked that the juror be removed.

The trial court's initial response was that it was going to excuse the juror stating, "I'm going to excuse her, not because I think—I'm just going to excuse her because I got two alternates, and hopefully we'll finish this trial by Thursday. . . ." After the State and the defense agreed the trial

should be finished in that time, the trial court changed its ruling. The court explained its decision as follows:

I don't think she's done anything wrong. I was very impressed with the way she answered the questions. She's a school teacher, she's intelligent, she knew what to do. She handled it properly at the time, she didn't discuss it, and she reported it immediately. And so I ... I'm not gonna excuse her. I think she's a qualified juror. Had she answered the question in the same fashion as we were qualifying the jury, that she knew the cousin of the victim was working at the daycare, then I would not have disqualified her at that time. Of course you [the defense] would have had an opportunity to strike at that time.

The defense noted its exception to the court's ruling. It further requested, if the juror remained on the jury, the court continue to question her in the morning about whether she'd had any further discussions. The trial court agreed to caution the juror that she should not speak to anybody else about the matter and to report it immediately if anyone tried to speak with her. The court refused to excuse the juror, however, stating, "Because I think she's qualified, I think she's very honest when she answered the question. I'm very impressed with the way she handled the entire situation, and so I think there's no need to excuse her from this jury."

In its preliminary instructions to the jury, the trial court informed them they should not speak to anyone about the case, and told them to report back immediately if someone did try to speak to them about it. When the court later recessed for the day, it again instructed the jury not to talk with anyone about the case, and if anyone attempted to talk with them, they should report it to the bailiff the first thing in the morning. After the jury exited the courtroom, the trial court stated, "Let the record note that I admonished the jury not to talk about the case and to report back in the morning of any efforts to contact her. I looked directly at [the juror], who was in previously, and she nodded to me both times. So I don't think there's any point of me singling her out; she got the message and nodded both times." The court further cautioned the members of the victim's family present in the courtroom not to contact the daycare worker who was the cousin of the victim. When the trial resumed the next morn-

ing, the jury was questioned whether any of them heard anything about the case or were contacted by anyone in regard to it, and the court received a negative response. At the conclusion of testimony for that day, the trial court again instructed the jury not to talk about the case, and again received a negative response when it asked the jury the next morning if any of them had been contacted by anyone in regard to the case.

On appeal, Bell contends the trial court erred in refusing to dismiss the juror. He argues the colloquy between the court and the juror shows the juror was apprehensive and uncomfortable about the situation. He further maintains, even accepting the juror would not have been disqualified had the relationship been raised during voir dire, because this juror would continue to see the decedent's cousin who was caring for the juror's child, this juror would have been removed by the exercise of a peremptory challenge. Accordingly, Bell asserts the trial court abused his discretion in refusing to replace the juror. We disagree.

"A 'defendant has a constitutional right to be tried by competent jurors,' which 'implies a tribunal both impartial and mentally competent to afford a hearing.' " *State v. Hurd,* 325 S.C. 384, 389, 480 S.E.2d 94, 97 (Ct.App.1996) (quoting *Tanner v. United States,* 483 U.S. 107, 134, 107 S.Ct. 2739, 2755, 97 L.Ed.2d 90 (1987) (Marshall, J., dissenting)). A decision on whether to dismiss a juror and replace her with an alternate is within the sound discretion of the trial court, and such decision will not be reversed on appeal absent an abuse of discretion. *State v. Smith,* 338 S.C. 66, 71, 525 S.E.2d 263, 265 (Ct.App.1999). More specifically, "[i]t is within the discretion of the trial court to determine whether bias results from a juror's reception of outside information concerning the case being tried." *Washington v. Whitaker,* 317 S.C. 108, 118, 451 S.E.2d 894, 900 (1994). *See also State v. Ivey,* 331 S.C. 118, 123, 502 S.E.2d 92, 94 (1998) (noting a juror's competence is within the trial court's discretion and is not reviewable on appeal unless wholly unsupported by the evidence).

Bell relies on the case of *State v. Stone,* 350 S.C. 442, 567 S.E.2d 244 (2002) in arguing the trial court abused its discretion in refusing to remove the juror. In *Stone,* the defen-

dant's aunt was called as a witness during the sentencing phase of the trial. When the aunt took the stand, one of the jurors informed the court that she knew the aunt. Although the aunt's name had been announced at the start of voir dire, the juror did not know her name. The juror had lived down the street from the aunt some five or six years earlier, and they were casual acquaintances only. The State objected to the continued participation of the juror arguing it would be difficult for the juror to impose a death sentence on a former acquaintance's nephew, and the trial court removed the juror, replacing her with an alternate. Our supreme court reversed, finding the trial court abused its discretion in removing the juror. *Id.* at 448–49, 567 S.E.2d at 247–48. Bell maintains, unlike the finding of the court in *Stone* that failure to disclose an acquaintance with a witness would not have been a material factor in the exercise of a peremptory challenge, the juror here would have been removed by the exercise of a peremptory challenge and therefore the trial court abused its discretion in failing to remove the juror. In *Stone,* however, the court reaffirmed the following proposition:

> When a juror conceals information inquired into during voir dire, a new trial is required only *when the court finds the juror intentionally concealed the information,* and that the information concealed would have supported a challenge for cause or would have been a material factor in the use of the party's peremptory challenges.

*Id.* at 448, 567 S.E.2d at 247 (quoting *State v. Woods,* 345 S.C. 583, 587–88, 550 S.E.2d 282, 284 (2001) (citations omitted) (emphasis added)). Here, there is no concealment, intentional or otherwise, of information by a juror. Thus, the language from *Stone* regarding whether the information would have been a material factor in the use of a peremptory challenge is inapplicable to this case.

The record here discloses the trial court properly inquired into the juror's exposure to outside information and the effect the information would have on her ability to be a fair and impartial juror. Contrary to Bell's assertion, the juror unequivocally stated this outside knowledge would not affect her decision or her ability to be fair and impartial. Accordingly, the trial court did not abuse its discretion in allowing her to remain on the jury. *See State v. Ivey,* 331 S.C. 118, 122–23,

502 S.E.2d 92, 94 (1998) (holding, where juror sent note to judge during trial that she knew individual who allegedly loaned murder weapon to defendant's accomplice, trial judge properly inquired into the effect juror's knowledge of this person would have on her ability to be fair and impartial, and juror unequivocally stated such knowledge would have no effect on her ability to render an impartial verdict, the trial judge did not abuse his discretion in allowing juror to remain on the jury); *Washington v. Whitaker,* 317 S.C. 108, 117–18, 451 S.E.2d 894, 900 (1994) (holding, where juror heard a radio announcement concerning the case on the third day of trial but unequivocally stated she would not permit broadcast to influence her decision, trial court properly denied motion to remove juror).

Based on the foregoing, Bell's convictions are

**AFFIRMED.**

ANDERSON and BEATTY, JJ., concur.